Attorney General, Mr. Moore for the appellant, Mrs. Scarborough for the appellee. May it please the court, we're here on a de novo review of a grant of summary judgment by the district court below in this case. It's, of course, a rich history for this court. It's the third time this has happened. This case has been before the court. I know, Judge Kavanaugh, you've been on all three panels. I want to deal with what I believe to be the three fundamental errors that Judge Hovell made in granting summary judgment. First, she inexplicably found that there was no employer that took a materially adverse action against the appellant. I would note that the question here was not whether both the referral and the investigation, as the government puts in their brief, as they frame the issue. This case has never been about the investigation done by the security division. It's always been about the referral. We believe there was ample evidence, abundant evidence, that in fact the management of OIO, the Office of International Operations of the FBI, was well aware of what was going on and took part in this process. I think looking at the facts and inferences, reasonable inferences from those facts, we can conclude that what happened here was a concerted effort by the management of OIO to retaliate against a seasoned, experienced FBI agent, Mr. Wilford Rattigan, who's in court today, by the way, who's now entering his 27th year as an FBI agent, and that this management had firsthand knowledge of what was happening here. And I think we laid it out fairly clearly in our briefs. I would just highlight the fact that there was a sense of parallel tracks going on in late 2001, early 2002. There were complaints that were being made by Mr. Rattigan at the time that he felt, whether you agree with him or not, that he felt that he was being discriminated against in terms of how he was being treated as the legate in charge of the FBI's Riyadh, Saudi Arabia office. There was also, at the same time, efforts being made, and there's clear, documented evidence on this, efforts being made by the management of OIO to go after Mr. Rattigan for having made those complaints. And the vehicle for that was Donovan Leighton. Donovan Leighton was assigned as a temporary duty assignment to Riyadh from November 26 to December 21, 2001. He was a very questionable choice for that position. He had, less than a few months ago, had gone AWOL from his post as a legate in the Caribbean. He had an admitted problem with alcohol. He was in alcohol rehab. There was even, it clearly was, there was no justification for, not only for Leighton to be given this assignment, but for him to even have access to confidential materials that violated the FBI's own guidelines. But nevertheless, they sent him there, and he made certain observations while he was there, observations that no other temporary duty employee had made in the years that they had been assigned to Riyadh. And in fact, Mike Pismuca, who was the section chief of the Office of International Operations, had questioned TDY employees when they came back, looking for information about how the office was running, looking for information about Rattigan. He came back and ended up writing an 18-page, single-spaced electronic correspondence that contained an incredible amount of unsubstantiated and false allegations about Mr. Rattigan. Was that just the work of... Did the second panel regard four of the six claims as truthful? Judge, we don't think...  Judge, we would dispute... One, two, five, and six. We would dispute... The only thing that we would accept as truthful was that, on occasion, Mr. Rattigan wore Saudi Arabian native dress. But the issue there was not whether that was a fact that would lead... that would, in and of itself, justify an investigation. The executive order in this one, two... I'm not sure what the number is. I've lost the number. But the executive order at issue here requires an agency like the FBI to be concerned about conduct that raises the reasonable suspicion that somebody is a threat to the national security. The issue of whether he was in Arab dress was not a fact that would do that. But that doesn't go to knowing falsity. Right, Judge. Right. I'm just talking about knowing falsity, which is what we have to be concerned with. Right. And I think that it's clear that the OIO management, Mike Pizmuka, Leslie Kazaban, who was the assistant director of that division, Corey Gleisher, that they knew that the information in this electronic correspondence, this 18-page single-spaced document, was false. In fact, they participated in manufacturing it. I'm sorry. My question was, were there not four out of the six claims in dispute in the previous cases? No, Judge. Were not four of them, all but items three and four, conceded as truthful? You switched the topic to being irrelevant or having implications that were irrelevant, but that's not a question of truthfulness, much less it's not a question of falsity, much less a question of knowing falsity. We articulated in our brief on page 34 to 42, and also in the affidavit that was submitted to Judge Avell below, and went through each item, item by item in that EC, demonstrating why the allegation was false and why the management of OIO, which is, after all, the employer who caused this retaliation, demonstrating that these allegations were false. I think what Judge Williams is asking is, in Radigan 2, didn't we, in a way, foreclose you from making some of the argument you're making now? In Radigan 2, we say, the government opposes remand on the ground that the basic facts reported in the latent EC were largely uncontested at trial. And then we said, as to many of the allegations in latent EC, the government is certainly correct. Now, I know you're disputing whether the government is certainly correct, but we're bound by what the previous panel said. Well, first of all, I don't think the panel was in a position to find the facts in this case. I think that was properly for the district court. Well, whether it was proper or not, the panel did say the government is certainly correct. Doesn't that bind us? No, I don't think it does, Judge. Why not? Because the court, on Radigan 1 and Radigan 2, was talking about, by way of example, certain facts that may or may not be true. I understand there's language that says it's true, but there was never a concession by the plaintiff that any of that was true. That was hotly debated. But the court says, follows up, although Radigan claims these allegations were in dispute, his evidence suggests only that he had previously explained this behavior to his supervisors and provided an innocent explanation. While this may indicate that OIO officials had little reason to believe that Radigan's actions raised legitimate security concerns and issued as no relevance under the knowingly false statement, it does not suggest that Leighton reported or that OIO officials inferred factual information they knew to be false. Then it lists a separate set of items which are open to discussion. But it does sound like, for purposes of the remand, the panel has already decided some elements of the EC as being true. And I understand that you dispute that, but we have to follow what the previous panel says. Well, right. And neither side chose to file a petition for certiorari to challenge that. I don't think our failure to do that, given the fact that the case was remanded to the district court using a new standard that had never been applied for the court to then, for the parties then to deal with the question of whether there was retaliation or this knowing falsity standard, I don't think this court is bound by that language in the previous opinion. I'm sorry, Judge? The previous panel did feel that it could apply its principle to the record before it, and it did so. And Judge Garland says we're bound by that. Well, you have to add, that gets really to the heart of the issue in a way, is that are these facts in and of themselves knowingly false, or are they facts that suggest some concern about whether he's a risk to national security? Yeah, but the panel addressed that too, and it explicitly excluded that kind of claim. And that's why we dispute, that's why we think this standard that the previous panels have set forward is unworkable. And if you look at this. And I know for sure we can't talk about that, right? That's for the en banc court, right? This is something they're reserving just for the en banc court. Right, I understand that, Judge, and I'm not going to suggest that you should. You won't help any to argue with us, because we're not going to have any power to do anything about it. Save it for the petition for rehearing en banc. I understand, and I'm not going to do that. All I'm saying is the issue of what is knowingly false can't be taken out of the context of what's happening there. And if you look at what the district court did below, it just simply accepted the fact that Layton was a lone actor, that he wasn't, there was no involvement with management in constructing this EC that was full of, as they themselves said when they reviewed it. I mean, you have to understand, the evidence was that the management of OIO got that EC, Walt Smith, who we didn't have a chance to depose because we didn't understand that we were operating under a different set of assumptions then, went through that EC line-by-line, page-by-page, made comments, and they... I'm sorry, I mean, from the first of these cases, I haven't understood how that helped you. I'm sorry, Judge? I haven't been clear at all how the Smith edit, if you will, helped your case. As I understand it, your claim is that Smith looked at it and urged that it be sort of trimmed, cut back, made cleaner. He made comments about it. He said, and it's Plaintiff's Exhibit 17, he said, focus on the issue of, first and foremost, being the most important issue, the issue of fraternization with foreign nationals and sexual relations with the same. Second, this should be paired with his absence from LEGAC. It may have been bad editorial advice. I'm sorry, Judge? But from what you say, it doesn't sound like editorial advice to concoct new things and false things. It's not. It's a question of are they... It's not as... The reason it's important is Judge Hovell said what Layton did does not implicate what the employer could be held liable for for retaliation. We think that was wrong. We think that was an error. We think that she overstepped her bounds as a determining summary judgment by finding facts that are not supported by the record. The record is clear that the management of OIO, and there's a Mr. Smith's email to when he's gone through this, this document that he says describes as inflammatory and unsupported by any window in hearsay. He addresses it to Mike Pizmuka and Les Casaban, the two managers. I'm still not sure how that helps your case. Because then they respond... Someone tried to tamp down the character of the original draft. Because then they do something very important. Mike Pizmuka, and this is Plaintiff's Zubit 18. He says he has the finalized version of the EC, and he writes an email. He writes a handwritten note to Donovan Layton. He says, please review the draft EC and tells them to do something. Then he says, please add to attention security division. Now that's important because Layton testified in his deposition in this case that he was originally going to simply refer this to the employee assistance unit because he thought the agent had some problems. He then backed off of that trial and said, no, I was wrong. But this shows not that this all came from Layton, but that the management of OIO, Mike Pizmuka is saying, add this to the attention of the security division, send it on to the security division, knowing the consequences of that referral, which I don't think anybody would doubt. Referring somebody for a security investigation is an adverse employment. How does that suggest that Pizmuka knew that anything in it was false? I mean, I can see an argument the other way, but I don't see how it helps an argument that he knew it was false. I'm at a loss to know how to respond to that because in each and every instance that we go through in our brief, I can go through it now, but it's in the brief, pages 34 to 42. It's also in the affidavit that Mr. Radigan submitted in opposition to summary judgment. It goes through each point, point by point, and demonstrates how it's inaccurate. The four things that you talk about, the soddy attire. Yes, he was wearing soddy attire on occasion, but no, he never wore it at work. It was always after work, and it was never concealed. It was, in fact, publicized throughout the FBI. They knew it was going on. They knew there was no indication that that suggested anything about whether he's a loyal servant of the United States government. Can I ask you this? Assume for the moment that we actually are bound by the prior panel's ruling about some statements being true or being uncontested. So after the prior panel ruled, the Supreme Court issued its opinion in Nassar requiring but-for causation for retaliation claims. Do you still dispute that that applies to cases involving the government? The but-for analysis? Yes. Well, we would take issue with that, but we would say that even under that standard, there's enough that's false that would have determined, that should have determined whether this thing was referred to the security division. Let's take this apart in two ways. What's the argument that it doesn't apply? The Supreme Court said for Title VII that you have to have but-for causation for retaliation. Both the Second Circuit and the Sixth Circuit since then have both held that that applies to cases against the government. What's the argument that it doesn't apply for cases against the government? I think the standard has long been that if it was a motivating or substantial factor. Yes. But I understand. That was a standard until, in this circuit, it was uncertain. Right. We said in two cases, Borgo and Porter v. Natsios, that it's undecided in this case whether it's mixed motive or not. Right. And that's what the panel had before it when it decided Rattigan too. But then the Supreme Court made quite clear that now the standard is but-for. All right. I would say, Judge, it doesn't trouble me, the but-for standard. In fact, that's what the jury was instructed. If you look at the jury's instructions, they were instructed that the plaintiff had to show but-for causation. If we assume for purposes of the discussion that there are some true things in the referral and some knowingly false things in the referral, how can we conclude that the but-for, the knowingly false things, there wouldn't have been a referral? You would have to evaluate the true things, right, in order to do that. Well, Judge, I think that juries are asked all the time to parse evidence, to make a determination whether there's enough there that would have affected whether there was a referral. That's right. To the security. They'd have to weigh the significance of the true things. Right. But isn't that exactly what we said in Rattigan too can't do? No, I don't think so. I think in Rattigan, I think this Court in Rattigan too said there are some things that maybe there's not a dispute, although we dispute that, but there are clearly things that are a dispute, such as whether he's- But Rattigan too was under the circumstances where a mixed motive theory was acceptable, and if it isn't acceptable about any more, we have this problem. In Rattigan too it says, can't weigh this- a knowingly false standard obviates the need for jurors to weigh the strength of the information reported or to second guess the employee's determination that seemingly doubtful or insignificant information warranted reporting. So if there is some true information in there, we would have to weigh that. The jury would have to weigh that information, right? Weigh it against whether or not that's enough to cause a referral. I mean, I understand the dilemma here, but if you don't allow the jury to weigh stuff that's true and stuff that's clearly not true, then you've eviscerated Title VII. Well, then you have a referral that is wholly false you can still bring a case about. Yes, but all a government agent has to do is throw in one true fact or two true facts, and then, well, you can't parse that out. You can't parse out what's true and what's not true. But this sounds like the argument you want to make to the en banc court then, right? I mean, it's your argument about why the panel's decision doesn't go far, goes too narrow, and, of course, the government has the opposite argument, so you'll both have plenty of an opportunity to raise that. But I'm asking you to think about this within the constraints of what our three little people here can do. I understand, and you're far from three little people. Well, for this purpose, I'm afraid we have to. I don't mean that literally. Judge Williams is very tall. But I think even with Nassar and how that's affected this, I think there is still room under the regimen of the tension between the executive order and Title VII in a properly pled case, and here, don't forget, we're talking about a case where all these allegations were found to be unfounded in a subsequent investigation. So that has to represent something. I mean, even though the circuit has found that some of it was true, the FBI's own security division found that all of the allegations in this AC were unfounded. And then a jury, hearing this evidence and being instructed on but four. Unfounded or not controlling on the issue of security. Which? I'm sorry, Judge. So they found it to be untrue, but I thought it was conceded, for example, that wearing Saudi outfits was conceded to be true. It's a question of how it fits with the security analysis. Well, I think. That's what you said earlier in the oral argument. Yeah, I'm perhaps making an argument that that's suited for the unbunked panel, but I don't think you can have a standard of knowing falsity divorced from the context in which the facts arise. And that's what Rattigan II has led to. You have opinions now in the district court which are raising the same problems that Judge Kavanaugh, you mentioned. Okay, I think you're right. This is an argument for the. I'm just willing to let you finish the sentence. Just leave it at Judge Kavanaugh. You were right. He's happy with that. I apologize for going over that. We'll hear from the governor. May it please the Court. Charles Scarborough for the Attorney General. In its prior decisions in this case, this Court recognized that allowing Title VII claims premised on allegations that an employee reported concerns about another employee's fitness to hold a security clearance presents serious egan problems because it would shield the reporting of information necessary for executive branch officials to make predictive judgments about who may hold security clearances. In light of the essential role that reporting even questionable or marginal security concerns plays in this context, this Court sharply limited the kind of claim that could proceed without running afoul of egan, holding that it was restricted to allegations that an employee reported information that he knew to be false. And the Court then remanded to the district court to determine whether there was sufficient evidence of knowingly false reporting to allow the plaintiff here to get to a jury without violating egan. And on remand, the district court properly exercised the gatekeeping function that this Court assigned to it and held that the FBI was entitled to summary judgment on plaintiff's retaliation claim for two reasons. First, the Court properly held that plaintiff failed to present any evidence that any of the supervisors reported information to the security division that they knew to be false. And in the alternative, the Court held that no reasonable jury could find that retaliatory animus, rather than legitimate security concerns, was the but-for cause of the referral to the security division. Let me start with the first of this. This is the Vance argument. Is that right? It's in part the Vance argument. I see sort of three paths to affirming the district court. One is the path that the district court took at the threshold is that there was no relevant supervisor for whom the FBI could be held liable. And that's based on Vance. Well, it's based on Vance and Farragher and just general vicarious liability. Well, those are harassment cases, right? Those are cases about the nature of the workplace, right? Yes. Okay. And your argument is that that applies even to a substantive discrimination or retaliation claim, that an agency is only liable for actions by a supervisor. Is that right? Yes, Your Honor. And the reason for that is the same as the reason it would be in the sexual harassment context. In a hostile work environment, sort of at some level, you know, the question becomes was the employer negligent in allowing it to go forward. Here, it's a similar sort of question. There's another line of cases. You know the cat's paw cases? Yes, Your Honor. And the Supreme Court has affirmed that application of Title VII for retaliation claims and for discrimination claims. Although the case itself wasn't a Title VII case, but in Staub, the case, the court says, that an employer may be held liable for employment discrimination based on discriminatory animus of an employee who influenced but did not make the ultimate employment decision. In Griffin v. Washington Convention Center, we did the same. And the Seventh Circuit, which started this cat's paw theory, said the same in Nichols. That is where an employee has discriminatory animus or retaliatory animus. Understood. And it's adopted by the supervisor, perhaps without the supervisor's knowledge, that's imputed to the employer. Understood, Your Honor. So how do you square that with what the district court did here, relying only on Vance, without even mentioning the cat's paw case? Well, first of all, the plaintiff accepted sort of the supervisory liability theory below. I understand the argument. I understand. No, no, but I understand it's possible the case could be resolved on a forfeiture grout. Understood. So I'll leave that aside for now. I think the critical reason why the cat's paw theory doesn't work is that Donovan Layton, the person who is supposedly his discriminatory animus is going to be imputed up to the supervisors, had no retaliatory motive. There's never been an allegation that he's had a retaliatory motive. So that's the fatal defect in having a cat's paw theory, perhaps why it was never raised in this case. It's simply not a theory that applies here. And I would point out that in terms of the vicarious liability principles, there's even more reason to be careful about holding an employer liable for sort of one-off comments by low-level employees, you know, reporting concerns. And it's especially important where here you have a system under the Executive Order 12968 in which employees are encouraged and expected. They are required to report even mundane things that may, in retrospect, be wrong, be trivial. And this Court, in its prior decisions, recognized all that. But what about the prior decision saying that or seeming to say that it would be good enough if Leighton alone had knowingly reported false information? I think that the Court – Is that just wrong? Well, I think what the Court said in Rattigan, too, was Leighton or his OIO supervisors. Right. I think the Court – you know, I don't hate to tell a member of the panel what the panel was thinking, but I think they just weren't thinking about sort of the question down the line of employer liability. We hadn't gotten to that point. The case, as you know, had been litigated and presented to the jury on a different premise, on the premise that it was the Security Division's investigation that caused the action here. So we never really got to thinking about, you know, what the referral was and who might or might not be liable for the referral. This is an unusual case in that respect in the sense that, you know, the employer did, as far as we can tell, exactly what it was supposed to do. It got, you know, concerns raised by a lower-level employee. They elevated them to the proper people in the FBI. The FBI quickly undertook an investigation and decided, no, these aren't security concerns that warrant revocation of the Security Division. So you think that the not one-off but repeated description of Leighton or OIO repeatedly throughout Rattigan, too, is just they weren't thinking about what the problem was? I don't think that they were dealing with the issue of vicarious liability. That was not something that was litigated in the prior appeal. But the only issue was, I mean, the only issue, as I said, in Rattigan, in Title VII, is the employer's liability. So somehow it would only be the employer who was liable. There's no argument that Leighton was going to be responsible. I understood, but I think that the reference is there. Again, I hate to sort of say, tell the panel what the panel meant, but what I recall from Rattigan, too, is Leighton or his OIO supervisors is sort of the repeated refrain that is made. And what I do know is that we didn't talk about employer vicarious liability here in the prior appeal because it was submitted to the jury on a different theory, on the theory that it was the Security Division's investigation that caused Mr. Rattigan's harms here. So that's one path that the Court could affirm on, is that you can only be held liable for the acts of supervisors. That's sort of standard. But you don't even have to go that far. You've also argued that Leighton had no retaliatory motive. That's correct, Your Honor. Thank you. And that's exactly what I was getting to, is that you could sort of put that aside, leaving aside the waiver point or the fact that we think we're right on the vicarious liability principles, and you could find quite properly that nobody did anything and reported anything that was knowingly false. You heard remarkably little from the other side. But that requires agreeing that discovery wasn't in order, right? And the panel said that because people didn't know the standard was going to be knowingly false, there was room for discovery. So you can't now say they have no evidence of knowingly false and they weren't entitled to any discovery of knowingly false. Again, what the panel said, I think, at the end of Rattigan, too, is the district court is going to be the gatekeeper, having sat on this case for a very long time, and decide whether there is any necessary discovery. And what happened when they went back to district court is you had to. It doesn't quite say that. It says Rattigan had little reason to thoroughly develop evidence of knowingly falsely. Given this, and given that the record contains some evidence that could form the basis for a claim of knowingly false security reports, we shall remand for the district court after permitting any necessary discovery. That doesn't mean that it's up to the district court to decide. It sounds, once again, that the panel has decided that they didn't have an opportunity to develop evidence of knowing falsity. So they were going to be permitted to do necessary discovery to find it. I agree that the panel is certainly leaving open the possibility that there would be discovery. I do not think that the panel was directing the district court. I don't think that sentence is fairly read as directing the district court to conduct discovery. If we accept that the panel said that he had little reason to thoroughly develop evidence of knowing falsity in the district court, why wasn't it an abuse of discretion for the district court to let them try to develop evidence of knowing? For the standard reasons that whenever you're asking for discovery, you have to show what it is that you need. And what you got with the presentation in district court, what you got was an attempt similar to what you got in this court just now to relitigate all the same issues, issues that this panel sort of foreclosed, the wearing of the Saudi garb, the, you know, making himself only reachable through the Mabahid, the participation of the Hajj, all those things. And that was what was presented to the district court as what he wanted in discovery. And the district court got frustrated with that and said, okay, I'm going to, you know, do this on summary judgment and you can file Rule 56D affidavit and explain to me what you need. And the district court, again, you know, exercising the role assigned to it by this court, the district court was, as this court said in its decisions, in the best position to decide whether the plaintiff's claims could proceed. The prior decisions are replete with references to the fact that the district court is going to be able to, in the best position to determine and to weed out claims that would, you know, not be able to proceed without running afoul of Egan. The district court also, of course, had the independent grounds that Judge Garland, as you pointed out, that there was, you know, an answer. I'm stuck on the discovery issue for a minute. It says that in the 56D affidavit the plaintiff asked for additional discovery about the interactions that took place among the five of them. The process that led to the creation of the EEC was never the focus of discovery that was completed before the first trial. Now, the district court didn't say it was rejecting it for that reason, did it? What was the reason that the district court gave for rejecting the discovery? Primarily, it was that there wasn't anything sufficiently identified. I mean, again, it was – Well, they want – obviously, they want interactions between these people, obviously on the hope that there will be some statements about knowing falsity in there. Well, part of it – That doesn't seem on its face like unlikely and impossible. Well, a lot of discovery had already occurred, and the district court was well aware of that. In fact, a trial had occurred. This is not one of these cases where the plaintiff has been cut off at the knees and, you know, it's a black box as to what happened. There was discovery. There was a multi-day trial in this case. The district court was aware of that. It's true, but the prior panel said the district court had to keep in mind that this was not the standard at the time of the previous discovery. So how did the district court do that? The district court, again, as I was trying to explain before, was frustrated, I think, with plaintiff's counsel for coming in and trying to relitigate a lot of the same issues and not basically focusing in on the issues about the nurses being used as a euphemism for prostitutes and the wild parties at Mr. Rattigan's house. That's not what the court said. The court's explanation, which is one paragraph on page 631 of the appendix, is, first concerning supervisory liability, plaintiff testified at his deposition at trial that, I'm sorry, how does the guy with the P, how do you pronounce his name? I'm not. Pizmuka. I've been saying Pizmuka. Okay. Was a supervisor and that Layton was not. He further testified that Pizmuka did not know the truth. Plaintiff had the opportunity and incentive to explore what he knew or did not know during prior discovery and trial. But this court said that he didn't, that they didn't have the incentive to do that. So is that consistent with what we told the district court? I think it is, Your Honor. Again, the district court, there are many references in this court's prior opinions to the district court being the one in the best position to understand what has transpired before and to understand how the claim might run afoul of Egan. And, again, keep in mind that you're here on a very limited inquiry into, you know, knowing falsity. And there just wasn't any focus, any specific focus as required under Rule 56D on those sorts of things. Instead, there was an attempt to relitigate what people knew or should have known. There was an attempt to sort of present a collusion theory when the actual inquiry is what an employee actually knew was false at the time. So the district court, again, exercising the role that this court said it was supposed to do, you know, understood that there wasn't anything more that could be gained by discovery and essentially said enough is enough here. Further questions from the panel? We have one minute and 18 seconds. It seems to me that the panel understands our position, so I'm happy to sit down. Thank you, Your Honor. All right, does the other side have any time? All right, we'll give you one minute. First of all, this case was never about whether there was a security investigation that caused harm. Let me just ask, what was it that you were seeking in discovery to which the second panel entitled you to? Well, I think you got to it. I think there were certainly, there were, in order to, if the employer here, which we believe the employer was not latent, the employer was OIO management. If the employer, if we're testing whether the information the employer had was knowingly false, which we didn't explore in a. . . What was the kind of discovery you were asking for that would allow you to do that? To do further depositions of Short, of Walt Smith. We never did the deposition of Walt Smith. What were you planning to ask? Did you know that all the statements here were false? Do you have another question other than that? You don't expect them to answer yes to that. Well, what did you know? And there is documentary, well, I don't know. There's some stuff that there's documentary evidence showing that it clearly was false. Four of those things that. . . That's evidence you already have. Right, but I would certainly like the opportunity to ask that person, if he's going to come in and lie, that's important information. I would just say, and I appreciate the Court's time, that it can't be the case that any truthful allegations in a referral means that the case becomes non-justiciable, which is what the government's argument is. I think a jury, juries often have to parse out facts. The most important facts here were in dispute, whether there was foreign influence. That is the most important fact here. And the panel in Rattigan, too, said that's clearly in dispute, whether there was foreign influence by him having parties with prostitutes and the nurses were really a euphemism for prostitutes. That clearly was enough evidence, we believe, to get to a jury. Unless there's any other questions, I'll rely on it. Hearing none, we'll take the matter under submission. Thank you both.
judges: Garland, Kavanaugh, Williams